**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **LEGACY SEPARATORS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **Case No.:** CIV-14-267-HE |
| | ) | |
| **HALLIBURTON ENERGY SERVICES,** | ) | |
| **INC., and J. Wayne Richards, an individual,** | ) | |
| | ) | |
| **Defendants,** | ) | |

## COMPLAINT

Plaintiff Legacy Separators, LLC, ("Legacy") for its causes of action against Defendant Halliburton Energy Services, Inc., ("Halliburton"), and Defendant J. Wayne Richards ("Richards") and collectively ("Defendants"), alleges and states:

### Nature of the Action

1. This is an action for patent infringement and trade secret misappropriation.

### The Parties

2.     At all relevant times herein mentioned, Plaintiff was and now is an Oklahoma limited liability company whose principal place of doing business is and was Oklahoma City, Oklahoma.

3.     At all relevant times herein mentioned, Halliburton was and now is a foreign for profit business corporation, whose principal place of doing business is and was the State of Texas.

4.     Richards was President and Chief Executive Officer of Global Oilfield Services, LLC ("Global"), and subsequently Richards was an employee of Halliburton

after Halliburton acquired Global's corporate stock.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over this action under at least 28 U.S.C. §§ 1338 and 2201.

6.      Plaintiff brings its complaint under federal-question jurisdiction pursuant to the provisions of 28 U.S.C. §1331 with a supplemental state claim, and under federal diversity jurisdiction pursuant to the provisions of 28 U.S.C. §1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Defendants Halliburton and Richards in that:

(a)      Halliburton has done and is now doing business in Oklahoma and has many significant economic contacts with the State of Oklahoma, and

(b)      Richards has conducted business and had many significant economic contacts in the State of Oklahoma serving as the Chief Executive Officer of Global, and both Defendants committed acts of infringement and trade secret misappropriation in Oklahoma.

8.      Venue is proper under 28 U.S.C. §1391(b)(2) because the events giving rise to this claim occurred within this judicial district in Oklahoma City, Oklahoma.

## Fact Allegations

9.      Legacy is the owner of United States Letters Patent 8,424,597 (the "'597 Patent"), entitled DOWNHOLE GAS AND LIQUID SEPARATION,     which     covers technology for gas and liquid constituent separation in downhole fluids produced from oil

2

and gas wells.

10.     Legacy's managing member is, Guy Morrison ("Morrison").

11.     Morrison's background, experience, and knowledge of downhole gas separators uniquely qualified him to invent downhole gas separators, to understand how they function, and to research and develop new technologies and methodologies for the oil and gas industry.

12.     Morrison was an inventor of a first downhole gas separator patented by the US Patent Office as U.S. Patent No. 6,761,215 (the "215 Patent") and also a second downhole gas separator which is covered by the '597 Patent.

13.     After Morrison's first downhole gas separator was patented as the '215 Patent, Morrison continued to be engaged in the research and development of new technologies and methodologies for the oil and gas industry.

14.     Morrison is the sole inventor of the '597 Patent and is known in the oil and gas industry for his expertise in the specialty of downhole gas and liquid separation.

15.     Plaintiff was formed as a for profit Oklahoma limited liability company to conduct its primary business of employing Morrison's expertise, Morrison's business and technical confidential information, and Morrison's now patented technology in the manufacturing, assembling, selling, and use of gas separators under the '597 Patent technology.

16.     Global's principals acknowledged as early as January 2010 that the '597 Patent is a market differentiator technology.

17.     On April 13, 2010, Plaintiff entered into a Master Supply Agreement ("MSA") with Oilfield Products Supply Corporation ("OPSC"), a Cayman Islands company.

18.     The  MSA obligated OPSC to maintain secrecy of Plaintiff's confidential information, including the existence and substance of the MSA itself as well as Plaintiff's business and technical confidential information in the MSA and also arising from disclosures made by Plaintiff during activities associated with negotiating the MSA and performing under the MSA.  The confidentiality covenants in the MSA prohibit OPSC from disclosing Plaintiff's confidential information to any other non-affiliated party, person, corporation or entity without Plaintiff's prior written permission.

19.     Plaintiff was informed before executing the MSA that Global was an affiliate of OPSC and Plaintiff accepted Global as an affiliate of OPSC.

20.     On or about November 2010 Plaintiff was informed by Global that the MSA was being assigned by OPSC to Global.  Global sought and obtained Plaintiff's prior permission to assign the MSA from OPSC to Global.

21.     Global assumed all of the confidentiality covenants in the MSA as a result of the assignment of the MSA from OPSC to Global.

22.     The '597 patent issued from patent application serial number 12/886,207 (the "'207 Application") that was filed on September 20, 2010.  The '207 Application is a continuation-in-part of patent application serial number 12/612,065 (the "'065 Application") that was filed on November 4, 2009.  The '065 Application is a continuation-in-part of patent application serial number 12/567,933 that was filed on

4

September 28, 2009.  The '207 Application was published on March 31, 2011 as patent application publication number 2011/0073306.  The '065 Application was published on March 31, 2011 as patent application publication number 2011/0073305.  The '933 Application was published on March 31, 2011 as patent application publication number 2011/0073304.  Plaintiff disclosed to Global a copy of each of the '207 Application, the '065 Application, and the '933 Application prior to their publications.

23.     Each of the '207 Application, the '065 Application, and the "933 Application discloses an embodiment in which the patented gas separator is constructed of a bottom section by way of example having a capacity of 3000 barrels per day ("BPD") and a top section by way of example having a capacity of 1500 BPD in order to produce by way of example 1500 BPD of a well fluid that is a mixture of liquid and gas constituents.

24.     Global sold and Halliburton currently sells gas separators that are operably designed to produce fluid at various other rates than the 1500 BPD rate in the '597 Patent disclosure.

25.     Plaintiff provided Global with technical confidential information that defines a custom construction for optimizing the operation of the '597 Patent technology for a particular well's desired production rate.   Plaintiff's technical confidential information is neither necessary for the skilled artisan to make and use the claimed invention covered by the '597 Patent nor contained in the disclosure of the '597 Patent. From a time before execution of the MSA and while operating under the MSA, Global routinely sold each gas separator by first providing Plaintiff with the corresponding

well's desired fluid production rate.    From Global's specification of the desired production rate, Plaintiff provided Global with the optimal capacities for each of the bottom and top sections in the gas separator.

26.    Plaintiff expressly told officers of Global, including at least Richards, that Plaintiff had disclosed its technical confidential information for gas separator optimization to only three of Global's employees, on a strict need-to-know basis, in order to keep Plaintiff's technical confidential information for optimization as secret as possible.

27.    Halliburton has admitted in writing that before Halliburton's acquisition of Global, Global disclosed Plaintiff's business confidential information to Halliburton at least in the form of the existence and substance of the MSA.    Plaintiff's business confidential information and Plaintiff's technical confidential information is referred to herein collectively as Plaintiff's "trade secret information."

28.    On or about July 2011, Plaintiff suspected that Global was endeavoring to sell either its assets and/or stock to Halliburton and Plaintiff made inquiry to Global principals, including at least Richards, about that issue.    Richards vehemently denied that Global was negotiating to sell Global to Halliburton.

29.    In August, 2011 Global informed Plaintiff that Global intended to perform some testing on gas separators that were constructed in accordance with the '597 Patent technology.    Plaintiff objected to the testing to Richards after Plaintiff had been informed that Global was in the process of negotiating a sale to a non-affiliated party of the MSA. Plaintiff expressly notified Richards that any such testing would be detrimental to

Plaintiff's ongoing efforts to maintain the secrecy of Plaintiff's trade secret information. To placate Plaintiff, Richards responded that he would order the testing cancelled, but Plaintiff has not received any evidence that the testing did not occur despite the representation to Plaintiff.

30.     Contrary to the untruthful denial of a pending sale by Global, Global was secretly negotiating with Halliburton to sell all of its stock to Halliburton and Plaintiff is informed and believes and thereon further alleges that during the course of those secret negotiations, Global provided Halliburton with Plaintiff's trade secret information without first securing Plaintiff's written consent in order to consummate a lucrative sale of the Global stock to Halliburton that Plaintiff is informed and believes and thereon alleges was a sum in excess of Three Hundred Million Dollars ($300,000,000.00). Halliburton had no business relationship with Plaintiff and was a competitor and not an affiliate of Global or OPSC at the time Halliburton misappropriated Plaintiff's trade secret information in pursuit of Halliburton's acquisition of Global.

31.     In or about October 2011 Halliburton requested from Global and Global, unbeknownst to Plaintiff, disclosed to Halliburton Plaintiff's trade secret information in the form of what Plaintiff's patent infringement position would be for the '597 Patent in the event an allegation was made by the owner of U.S. Patent number 6,761,215 (the "'215 Patent").  Subsequently and after purchasing Global's corporate stock, Halliburton purchased the '215 Patent from a third party in December 2012 immediately after Plaintiff notified Halliburton that Plaintiff had obtained a Notice of Allowance from the Patent Office for the '597 Patent.  Plaintiff is informed and believes and thereon alleges

that neither Halliburton nor Richards believed Plaintiff would obtain the '597 Patent.

32.     To consummate the stock sale, Halliburton and Global acted in concert to hide their negotiations and sale agreement until after the purchase and sale transaction and continued to obfuscate the transaction to prevent Plaintiff from learning of Halliburton's  misappropriation of Plaintiff's trade secret information while acting in concert with Richards.

33.     After finalizing the purchase and sale of Global's corporate stock to Halliburton, Halliburton engaged in a course of deception and prevarication in an effort to cause Plaintiff to believe that Global and not Halliburton was still the purchaser of gas separators that were being supplied by Plaintiff and to secrete Halliburton's  ongoing misappropriation of Plaintiff's trade secret information.

34.     On numerous occasions during the latter part of 2012 and during 2013, Plaintiff sought to determine if Global or Halliburton was the purchaser of the gas separators supplied by Plaintiff.

35.     Halliburton represented to Plaintiff that Global was the purchaser despite several occasions when Halliburton sent Plaintiff purchase orders and asked Plaintiff to send to Halliburton W-9's that caused Plaintiff to inquire as to whom the true purchaser was.

36.     Plaintiff asked Halliburton if it or Global was the purchaser of its gas separators and was assured that it was Global and that the purchase orders sent to Plaintiff in Halliburton's  name were sent in error.

37.     Halliburton's  counsel in February, 2013, sent Plaintiff's counsel an email

8

asking, "If I provide you with a document confirming that Halliburton acquired 100% of the equity in Global, can we get the documents I requested below?"

38.     Despite Halliburton's   insistence and representations that Plaintiff was dealing with and supplying gas separators to Global, in the fall of 2013, Halliburton's counsel finally advised that a "merger" occurred in August, 2013, and that Global was merged into Halliburton.

39.     Despite Halliburton's  multiple representations that Plaintiff was supplying gas separators to Global who was listed as purchaser on most of the purchase orders to Plaintiff, Halliburton had assumed control and made all the business decisions for Global from and after the purchase and sale of Global's stock even though Halliburton and Global had a negotiated "earn out" provision in their sale agreement that allowed Global to enhance the sale price that it was receiving from Halliburton by performing services and increasing Global's sales during 2012.

40.     Plaintiff is informed and believes and thereon further alleges that Global's shareholders including Richards further enriched themselves by meeting the contractual sales goals as set out in the "earn out" provisions by selling more gas separators supplied by Plaintiff.

41.     Because Plaintiff's patented gas separator technology has been an industry success and the source of significant gross sales to Halliburton, Halliburton with knowledge of Plaintiff's parts supplier in China secretly negotiated with and purchased Plaintiff's Chinese manufacturer-supplier and Plaintiff has been informed that Defendant Halliburton will no longer sell Plaintiff the required gas separator parts or purchase

anymore gas separators from Plaintiff.

42.     Halliburton has stated in writing that prior to Halliburton acquiring Global, when Halliburton was not an affiliate of Global, Halliburton had obtained and used a copy of the MSA.   Richards has stated in writing that prior to Halliburton acquiring Global, Richards provided Halliburton with information requested by Halliburton for the purpose of culminating the sale of Global to Halliburton.   Global, including Richards, obtained Plaintiff's trade secret information under circumstances giving rise to a duty to Global to maintain the secrecy of Plaintiff's trade secret information.   Halliburton misappropriated Plaintiff's trade secret information and at the time Halliburton did so Halliburton knew or had reason to know that its knowledge of the trade secret information was derived from Global who owed a duty to Plaintiff to maintain the secrecy of Plaintiff's trade secret information.   Global's disclosures of Plaintiff's trade secret information to Halliburton constitutes theft, misrepresentation, and breach of a duty to maintain secrecy.   Halliburton's use of Plaintiff's trade secret information constitutes theft, misrepresentation, and inducement of a breach to maintain secrecy.

43.     Employees of Halliburton, including Richards, who at the time of executing the MSA were then equity owners of Global, were aware of Plaintiff's trade secret information while equity owners and officers of Global.

44.     Halliburton and Global knew or had reason to know that Global's disclosures of Plaintiff's trade secret information were done without obtaining Plaintiff's express or implied consent.

45.     Global's factual misrepresentations to Plaintiff and disclosures of Plaintiff's

trade secret information to Halliburton for self-serving purposes of maximizing sales of the '597 Patent technology in 2012 is willful and malicious trade secret misappropriation. Halliburton's factual misrepresentations to Plaintiff and total disregard for Plaintiff's protected trade secret information is willful and malicious trade secret misappropriation.

46.     Plaintiff learned in about November 2012 that Global was and Halliburton is re-assembling new gas separators and remanufacturing used gas separators in an effort to avoid paying Plaintiff for those separators under the terms and provisions of the MSA. Prior to November 2012 Plaintiff had been assured by a Global principal that Global was not re-assembling/remanufacturing gas separators provided by Plaintiff.

47.     After Plaintiff learned that Global was and Halliburton is engaged in re-assembling and remanufacturing the gas separators supplied by Plaintiff, Plaintiff on multiple occasions gave notice and sought an explanation from Global and Halliburton in view of Plaintiff's patented technology but Global and Halliburton have failed and refused to provide any explanation.

48.     Halliburton's silence and on-going re-assembly/remanufacturing despite Plaintiff's notice is willful and malicious patent infringement.

**FIRST CAUSE OF ACTION – PATENT INFRINGEMENT**

49.     Plaintiff incorporates paragraphs 1 through 48 as though set forth in full herein.

50.     Halliburton has directly infringed and continues to infringe the '597 Patent by practicing methods used to construct the re-assembled and remanufactured gas separators that are encompassed within the scope of the '597 Patent.

11

51.     Halliburton has known about the '597 Patent technology since Plaintiff's disclosure to Global of Plaintiff's trade secret information even before publication of the '207 Application, and Halliburton has pursued its knowing and willful infringement thereof in flagrant disregard of Plaintiff's rights thereunder.

WHEREFORE, Plaintiff, Legacy LLC, prays for the following relief:

(a) an accounting for damages resulting from Halliburton's infringement and the trebling of such damages because of the knowing willful and wanton nature of Halliburton's conduct;

(b) an assessment of interest on the damages so computed;

(c) an award of Plaintiff's attorneys' fees and costs in this action; and

(d) such other and further relief as this Court may deem just and proper.

**SECOND CAUSE OF ACTION – VIOLATION OF OKLAHOMA'S UNIFORM TRADE SECRETS ACT**

52.     Plaintiff incorporates 1 through 48 as though set forth in full herein.

53.     Plaintiff's business and technical confidential information related to its gas separator technology as used in downhole drilling and completion operations was and is protected trade secret information.

54.     Halliburton acting in concert with Richards misappropriated Plaintiff's trade secret information when Global and Richards shared Plaintiff's trade secret information with Halliburton during the course of the negotiations between Halliburton and Global for the stock sale and purchase as hereinabove alleged.

55.     Halliburton and Richards have used Plaintiff's trade secret information to

Plaintiff's detriment in that Halliburton acquired from Richards and Global access to the designs, manufacturing, assembly, sales, business, and usage of the gas separator technology and to Plaintiff's manufacturer and supplier of gas separator components, and it has caused Plaintiff damages in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00).

56.     Defendants' trade secret misappropriation should be enjoined as provided in 78 O.S § 87(A).

57.     Richards disclosed Plaintiff's trade secret information to Plaintiff's detriment in order to enhance his equity ownership in Global that was sold and transferred to Halliburton in the stock sale transaction between Global and Halliburton.

58.     Defendants were willful and malicious and Plaintiff further seeks punitive and exemplary damages and attorneys' fees as allowed in 78 Okla. Stat. §88(B).

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For its actual damages in a sum in excess of Seventy-Five Thousand Dollars ($75,000.00);

2. For exemplary and punitive damages as determined by the jury at the time of trial;

3. For an injunction against Defendants enjoining and restraining their further trade secret misappropriation;

4. Interest, pre-judgment and post-judgment;

5. For its costs and reasonable attorneys' fees;

6.   For such other and further relief as the Court deems just and proper.

Respectfully submitted,

WARD & GLASS, L.L.P.

_____S/Stanley M. Ward_____
Stanley M. Ward, OBA#9351
WARD & GLASS, L.L.P.
1821 E. Imhoff Road, Suite 102
Norman, Oklahoma   73071
(405) 360-9700         (405) 360-7902 fax

____s/Mitchell McCarthy_____
Mitchell McCarthy, OBA# 18418

HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON
100 N. Broadway, Suite 2900
Oklahoma City, OK  73102
(405) 553-2828         (405) 232-8004 fax

_____s/Phillips Free_____
Phillip Free, OBA# 15765
HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON
100 N. Broadway, Suite 2900
Oklahoma City, OK  73102
(405) 553-2828         (405) 232-8004 fax

ATTORNEYS FOR PLAINTIFF

PLAINTIFF ASKS FOR A JURY TRIAL